# FREEMAN, NOOTER & GINSBERG
## ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

75 MAIDEN LANE
SUITE 907
NEW YORK, N.Y. 10038

(212) 608-0808
Cell: (917) 847-1361

*NY AND CALIF. BARS

June 13, 2025

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

RE:  United States v. Vladimir Antonio Arevalo-Chavez
     Criminal Docket No. 22-429 (JMA)

Dear Judge Azrack:

We are writing to respectfully ask the Court to consider the following additional arguments with respect to the Government's motion to dismiss the indictment dated April 1, 2025 (ECF document #165): a) a supplement to our request that any dismissal be made with prejudice based on the newly-filed and translated documents related to the prosecution of our client in El Salvador, and b) additional support from recently-decided or recently-filed similar cases and new support from press and human rights organizations for seeking to insure that our client is afforded due process and an opportunity to raise objections to his being removed to El Salvador after the indictment is dismissed.

## PART I
### Any dismissal of the indictment should be "with prejudice"

We will not repeat our discussion of the reasons for a court to consider dismissing an indictment "with prejudice" when the Government has made the motion to dismiss without prejudice (see our letter of April 23, 2025, ECF #167), except to repeat that when there is evidence of "bad faith" on the part of the government with respect to its reasons for making the motion that the argument for

-1-

dismissing with prejudice is strengthened. In our letter we described some reasons to consider the motion to be made in bad faith, and further on in this letter we ask the Court to consider some new facts that have emerged with respect to those reasons.

### 1. Newly-Received Documents Show that Mr. Arevalo will not get a trial in El Salvador

The newly-received and now filed documents from El Salvador add an additional reason to believe that the Government's stated reason for moving to dismiss the indictment is being made in bad faith. The document filed as ECF #178-5, described as an arrest warrant, shows that on January 6, 2025 "final sentence" was "issued and pronounced final" by a court in San Salvador, finding Mr. Arevalo-Chavez guilty of two counts of violating the Salvadoran criminal law; and that he has already been sentenced to serve fourteen (14) years and twenty-five (25) years respectively on the two charges. It is not clear if those terms are to run concurrently or consecutively, but in either event, what is clear is that he has already been tried and convicted "*in absentia*." Our client avers that he never received any notice to appear in court to defend against the charges and was completely unaware of the judgment reflected in this document until we told him about it two weeks ago.

We do not know if the Government was aware prior to obtaining the Salvadoran documents (at the direction of this Court) that our client had already been convicted, but even if not, the Government's persistence in seeking a dismissal without prejudice for the reason "... so that El Salvador can proceed first with its criminal charges against the defendant under Salvadoran law. ..." (Motion dated April 1, 2025, ECF #155, page 2) cannot be a true and accurate justification for the request to dismiss the indictment because our client already has been prosecuted under Salvadoran law (without due process, we might add).

The Government's knowledge, at least as of receiving the Salvadoran documents, that our client has already been denied due process of law in El Salvador and is not likely to receive any in the future prior to his being incarcerated for most of the remainder of his life is, we submit, an indication of "bad faith" in its statement of reasons for moving to dismiss the indictment here.

## 2. The Government is aware that criminal prosecutions of alleged gang members in El Salvador do not meet the standard of due process.

Even if our client were to "reopen" his case and get a new trial in El Salvador, it is not likely that he will receive due process. It does not take much research for the Government to have discovered – even if our client had not already been convicted in absentia – that the "state of emergency" invoked by the administration of the President of El Salvador, Najib Bukele, has resulted in a legal system that is completely lacking in due process. Our own State Department, in its most recent annual report on the state of human rights in El Salvador (called the "country condition" reports and relied upon heavily in the immigration courts as an authoritative and impartial analysis of the state of human rights in each country of the world), starts the report as follows:

> "EXECUTIVE SUMMARY
>
> "Under the state of exception, reports of gang violence decreased significantly, allowing citizens to exercise their right to life, liberty, and security of person, and to engage in daily activities and commerce without the constant threat of violence and extortion. Arbitrary arrests and mass pretrial hearings, however, undermined due process and exacerbated historically difficult conditions in overcrowded prisons.
>
> "Significant human rights issues included credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary ..." <u>2023 Country Reports on Human Rights Practices: El Salvador</u>, page 1.

After discussion of the abuses that exist in the prison system (to be discussed herein later), the report discusses the lack of due process in the legal procedures now applied in cases in which a defendant is accused of being a gang member:

-3-

"E. DENIAL OF FAIR PUBLIC TRIAL.

"Trial Procedures

"The law provided for the right to a fair and public trial, but the state of exception suspended the right to be informed promptly of charges and the right to defense. Other rights were not always respected. The law allowed for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. On July 26,the Legislative Assembly approved amendments to the law that would allow collective trials with up to 900 defendants for those who were already detained under the state of exception and were charged as gang members." Id., at pages 8-9.

Human Rights Watch, a well-respected organization, has released a report in 2022 entitled "*El Salvador: Sweeping New Laws Endanger Rights*," discussing changes in the laws and actions by the President of El Salvador which deprive defendants accused of gang-membership or gang-related criminal activity of due process rights in the courts. A News Release issued by the organization begins with the sentence, "Sweeping legal amendments passed by El Salvador's Assembly in response to gang violence violate basic due process guarantees and children's rights. ... (*News Release,* hrw.org, April 8, 2022). Some of what is discussed is not relevant to our case, but one of the points made is as follows: "The legislature also modified El Salvador's Code of Criminal Procedure to allow for indefinite pretrial detention." [Emphasis added.]

Thus, again, the original rationale for requesting dismissal of the indictment against our client is either "bad faith," (including "conscious avoidance" of the truth) or an honest lack of information by the government at the time the motion was made. In either event it is not "good faith" to suggest that our client is expected at this point to receive a fair trial or any other due process of law with respect to the charges of which he has already been convicted in El Salvador.

### 3.  The Government is Aware that Prison Conditions in El Salvador are Inhumane and Amount to Torture

As we stated in our original application for the dismissal to be "with prejudice" the fact that the government has to be aware that if removed to El Salvador our client will face horrific and inhumane prison conditions. There is more evidence of that since the filing of our last submission. We expect that if our client is put into removal proceedings the likelihood that he will be tortured if sent to CECOT or any other prison being used for detaining alleged gang members would be a basis for withholding of removal because of Article III of the Convention Against Torture ("CAT")(1465 U.N.T.S. 85).

Again, our government's State Department's 2023 Country Reports on Human Rights Practices (*supra*), states as follows regarding the prison conditions as of that year in El Salvador:

> "There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse. The human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent. The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton. In March the newspaper *El Pais* interviewed several released detainees, one of whom stated prison guards beat his cellmate to death. Socorro Jurídico Humanitario reported that 21detainees died from a lack of medical attention. Cristosal reported two of the detainees who died had anemia and 11 died of complications from illnesses such as diabetes to chronic kidney disease." <u>2023 Country Reports on Human Rights Practices: El Salvador</u>, page 2.

In the same report, under the heading "Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and Other Related Issues" the following examples are noted:

> "Human rights organizations and media outlets reported complaints of abuse and mistreatment of detainees by prison guards. On July 14, a coalition of human rights organizations at an Interamerican Human Rights Commission public audience stated they collectively interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks. The coalition alleged the treatment of prisoners constituted torture.
>
> "On March 25, the newspaper *El País* reported a man released from Izalco prison said guards beat one of his cellmates to death with batons and the butts of their rifles. He also said guards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.
>
> "Cristosal spoke with the family of a prisoner who died of stomach cancer on February 10, after being released from Zacatecoluca prison on January 28. Cristosal reported his body showed signs of torture, including significant bruising on his back and stomach, as well as signs of malnutrition and gastrointestinal hemorrhaging." Id., at pages 3-4.

Again, this is the U.S. State Department report. It goes on to discuss the problems of severe overcrowding, a lack of food and potable water, and a lack of medical care and medicines (stating that even where medications were brought by family members "they often did not reach the prisoner.").

The 2023 report notes the construction of the new prison for "terrorists" which we now know as CECOT (Centro de Confinamiento del Terrorismo) had just been opened (as of January, 2023), but as of the date of the report there was little information on the conditions there. Since then there have been reports from human rights organizations and in the press showing that the conditions there are at least as bad as in the prisons the country was using before the "state of emergency." One of the most detailed and well-illustrated reports was printed by the Spanish newspaper *El Pais* on May 29, 2023 under the title "Inmates in El Salvador tortured and strangled: The report denounces hellish conditions in Bukele's prisons. The article starts with a summary statement:

> "Dozens of inmates died as a result of torture, beatings, mechanical suffocation via strangulation or wounds or were left to die because of lack of medical attention. That is the primary result of an exhaustive investigation by Cristosal, the primary civil society human rights organization in El Salvador, after a year of the state of exception implemented by the government of president Nayib Bukele in his so-called "war on gangs." *El Pais*, <u>Inmates in El Salvador tortured...</u>, May 29, 2023.[1]

The report gives many examples and illustrations of the torture inflicted on inmates at CECOT, including (for example):

> "One of the clearest cases is that of a 30-year-old man whose dead body was given to his relatives with a protuberance on the neck. The medical documents reported that he died as a result of "mechanical asphyxiation by strangling." The autopsy of another man, a 42-year-old who died in a police cell, determined the cause of death 'mechanical asphyxiation by choking.' ... <u>Id</u>.

> "Other cadavers presented other signs of torture. In the case of a 32-year-old man whose body was delivered to his family, the autopsy determined the cause of death was a 'severe contusion-type closed thorax trauma.' According to the report, the body had deep wounds on the elbow, blows on the forearm and a wound of approximately eight centimeters on the left side of the head. ... <u>Id</u>.

There have been a number of authoritative reports in the press which detail what happens to individuals confined in CECOT and the other prisons in El Salvador. As one reporter stated:

> "Within years [of declaring the 'state of emergency' due to gang violence] El Salvador had traded the highest homicide rate in the world for the highest per capita incarceration rate in the world. ... A

---

[1] https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html

recent court filing by Human Rights Watch stressed that people detained in CECOT are held almost entirely incommunicado, cut off from family or lawyers, and "only appear before courts in online hearings, often in groups of several hundred detainees at the same time." *The New York Review*, "The Roots of Bukele's Gulag," by John Washington, June 1, 2025.[2]

Those reports and articles give more detail. The Government must be aware of at least some of the reports of the prison conditions in El Salvador, particularly at CECOT which is clearly where Mr. Arevalo would be sent if deported to El Salvador. The willingness to allow that to happen, we submit, constitutes bad faith in making the application to dismiss the indictment.

### 4. Corrupt Bargain with El Salvador

The Government opposed our reliance on *United States v. Adams*, No. 24-CR-556 (DEH)(S.D.N.Y. April 2, 2025) stating that the case was inapposite because there was an appearance of "an alleged *quid pro quo* to exact policy concessions from the Mayor [the defendant]." Government letter dated April 30, 2025, [this letter does not appear to be filed on the public docket], at page 3. It now appears that there is a *quid pro quo* involved here, but not between the government and the defendant, but rather between the government and the President of El Salvador, for which our client is, in fact, the victim, as we will explain.

First, in the article from *The New Yorker* that we previously referenced, "The Terrorism Suspect Trump Sent Back to Bukele," (about Cesar Humberto Lopez Larios), dated April 18, 2025[3] the subtitle is:

"An MS-13 leader knew key details of a secret deal that his gang allegedly made with the Salvadoran President—then the White House put him on a flight to El Salvador."

---

[2] https://www.nybooks.com/online/2025/06/01/the-roots-of-bukeles-gulag/

[3] https://www.newyorker.com/news/the-lede/the-terrorism-suspect-trump-sent-back-to-bukele

The article describes the emerging information concerning Salvadoran President Bukele's deals with key MS-13 and other alleged gang leaders to make himself look good by reducing the violence inflicted on the population by the gangs in return for certain benefits secretly given to gang members. Note that this, in general terms, is referred to in the indictment in this case, ECF Document #18, at page15, paragraph 31:

> "31. Starting in approximately 2012, the *Ranfla Nacional* engaged in secret negotiations with members of the then-ruling *Farabundo Marti National Liberation Front* ("FMLN") party of El Salvador, and MS-13's principal rival, the 18th Street gang, to enter into a 'truce' to reduce homicides in El Salvador in exchange for transfers to less secure prisons, improved prison conditions, conjugal visits, cash payments, and other benefits and privileges."

Other details are included in the indictment.

That is not the secret deal that we are referring to here. The corrupt deal is between our government and President Bukele to dismiss charges pending in the United States against a certain number (and not all) of the alleged gang leaders who may have direct information about the "Ranfla" deal described in the indictment so that they can be returned to El Salvador and silenced by Bukele's administration there. The *New Yorker* article gives a detailed account of the background of the "secret deal" between Bukele and the gang leaders, focusing on the role of an individual named Elmer Canales Rivera (nicknamed "Crook de Hollywood" or just "Crook)(who is, as far as we can tell, in custody in Pennsylvania after being arrested in Mexico). Key sentences in the article on the importance of getting some of the gang members/leaders back include:

> "'The U.S. government's evidence implies that the gangs were Bukele's partners in dismantling democracy,' Jeannette Aguilar, a Salvadoran security analyst, told me [the reporter]. 'If the D.O.J.'s cases are able to move ahead, it could be the end of the Bukele regime.'...
>
> "Crook's testimony could have an outsized impact in El Salvador, where, even after the news reports and U.S. sanctions, many people

remain unaware of the evidence against the Bukele administration." Id.

Canales had been quietly released from custody in El Salvador after the deal he made with Bukele, but then eventually arrested in Mexico and sent to the United States (as our client was). The article ends with the following observation concerning Lopez Larios (a/k/a "Grenas")."

> "Ricardo Flores, a Salvadoran journalist who has followed the MS-13 prosecutions from the beginning, ... [said]: 'The D.O.J. has accused the Salvadoran government of escorting Crook, an actual terrorist, out of El Salvador,' Flores said. "And now another accused terrorist, Grenas [Lopez Larios], has been quietly delivered by the U.S. back into Bukele's hands." Id., emphasis added.

An online news source called *Dropsite* gives much more detail about Lopez Larios ("Grenas") and the apparent relationship between the U.S. government's motion to dismiss the indictment against Cesar Humberto Lopez Larios and the almost simultaneous removal of alleged Venezuelan gang members to El Salvdor to be confined in CECOT. The article entitled "Secret Bukele Deal Lies Behind Trump's El Salvador Deportations,"[4] dated March 30, 2025, by Jose Oliveras and Ryan Grim states among a great deal of other information, as follows:

> "... Not only did Trump deport Venezuelans who were likely completely innocent, but also a specific MS-13 members who is emblematic of alleged corruption at the highest ranks of the Salvadoran government; a man called 'Greñas.' ...
>
> "According to a federal indictment, as a leader of MS-13, Greñas was involved in secret negotiations between the gang and Bukele's government, aimed at lowering gang violence in exchange for political support. Bukele denies the negotiations ever took place, but has long sought to get ahold [sic] of high-ranking members of MS-13 who participated, working to keep such figures out of the hands of the United States before they can have their day in open court...

---

[4] https://www.dropsitenews.com/p/secret-bukele-trump-deal-grenas

-10-

> "But despite being a high-value target and a founding leader of MS-13, earlier this month on March 11, the U.S. government dropped all charges against him. Four days later he was on an airplane to El Salvador.
>
> "The same day, Trump had signed an executive order, invoking the Alien Enemies Act of 1798, a wartime law, allowing the government to detain and expel citizens of 'an enemy nation.' Greñas was among more than 250 people the Trump administration had placed on airplanes to El Salvador...
>
> "'One of the worries that Bukele has is what these gang leaders could say in U.S. courts said Ana Maria Mendez Dardon, ,,, [of the Washington Office on Latin America]. Especially what type of information they could reveal that might implicate Bulele.'" Id.

In an article in the online version of the *El Faro* newspaper from El Salvador, additional detail and confirmation of the deal between the Trump administration and the Bukele administration is elucidated. The article by Gabriel Labrador dated February 6, 2025, entitled "<u>Offering US His Torture Prisons, Bukele Wants MS-13 Leaders Back</u>"[5] is probably the first to outline the effort by Bukele to seek the return of MS-13 gang leaders who could implicate him in the negotiations between Bukele and the gangs for political support. At the end of the article, after discussing the Salvadoran efforts to get "Crook" (Elmer Canales) back from the United States, the article mentions that our client, Mr. Arevalo-Chavez, also known as "Vampiro," is one of the defendants in the United States that Bukele wants back in El Salvador so he can silence him:

> "Of the 27 defendants charged in the New York court, prosecutors named, in addition to Crook, six gang members for their direct participation in the negotiations with Bukele's government, known by the aliases <u>Vampiro</u>, Renuente, Cisco, Big Boy, Cruger, and Snayder. They are among those who Bukele has requested from the United States, in the words of Ambassador Mayorga, as a 'point of honor.'"

---

[5] https://elfaro.net/en/202502/el_salvador/27734/offering-us-his-torture-prisons-bukele-wants-ms-13-leaders-back

Id.,( emphasis added).

See also, article in *Mother Jones*, The Real Reason El Salvador's President Nayib Bukele Cozied Up to Trump," dated April 14, 2025, by Michael Montgomery.[6]

Finally, an article was just released online by *ProPublica* which recounts in detail the history leading up to the instant motion by the government to dismiss this case. In "Delay, Interfere, Undermine" by T. Christian Miller and Sebastian Rotella, *ProPublica*, June 12, 2025 [today][7], the authors not only recount the evidence of the corrupt deal between gang leaders and President Bukele, but include information about how USAID funds were used in the arrangement, and that Bukele's government blocked the extradition of gang leaders to the United States who have information about the "deal." The article points out that many of the Salvadoran defendants who were transferred to the United States arrived here because of the role of Mexican law enforcement (as in our case, and the case of Lopez Larios).

In the final section of the article the report recounts the motions to dismiss the indictments made in our case and in the case of Lopez Larios with the evidence that it is part of an agreement between our government and Bukele to help him get the people back to El Salvador who could give testimony against Bukele with respect to his corrupt deal with the gangs. The article notes:

> "Despite the harsh treatment of gang members — an estimated 14,500 people are now held in CECOT — one thing did not change: The Bukele government continued to refuse to extradite senior MS-13 leaders to the United States.
>
> "The reasons for Bukele's alleged protection of the gang leadership versus his relentless pursuit of the rank and file are the subject of speculation in both the United States and El Salvador. One possible

---

[6] https://www.motherjones.com/politics/2025/04/el-salvador-nayib-bukele-trump-deportation/

[7] https://www.propublica.org/article/bukele-trump-el-salvador-ms13-gang-vulcan-corruption-investigation

> explanation, according to current and former U.S. and Salvadoran officials: Bukele is aware that Vulcan [the name of the investigative operation] was gathering evidence that could lead to criminal charges and political damage. The imprisoned leaders are potential witnesses to his alleged deal with MS-13, while El Salvador's street-level gangsters are not. ..."

> "In filing the charges, prosecutors made their strongest public accusations yet about deals between the Bukele government and the gangs. Without naming the president or his allies, prosecutors alleged that MS-13 leaders agreed to use their vast political influence to turn out votes for candidates belonging to Bukele's Nuevas Ideas party in legislative elections in 2021.

> "The gang bosses also "agreed to reduce the number of public murders in El Salvador, which politically benefitted the government of El Salvador, by creating the perception that the government was reducing the murder rate," the indictment said.

> "As part of the arrangement, the senior MS-13 leaders demanded that the Bukele government refuse to extradite them, the indictment said. The alleged condition appears to be in effect. To date, none of the extradition requests for more than a dozen high-ranking gang members has been approved.

The article then discusses the role of the motions to dismiss the indictments made by AUSA John Durham and how the timing of the motion shows that it is part of the deal between the Trump administration to have El Salvador accept Venezuelan (and other) deportees who are not from El Salvador:

> "There has been a remarkable recent development related to MS-13, however. After more than five years leading the Vulcan task force, Durham wrote letters asking the judge overseeing the cases to dismiss charges against two gang leaders in U.S. custody, allowing them to be deported to El Salvador. The letters were dated March 11 and April 1, weeks after the Trump administration began negotiating the mass deportation deal with Bukele's government. ...

-13-

> "César Humberto López Larios, a member of the Ranfla known as "Greñas," ... López, identified in media reports, is featured in a slickly produced video posted by Bukele on X, kneeling in the prison, his head shaved. ...
>
> "Then, in April, Durham asked for the dismissal of terrorism charges against a lower-ranking MS-13 prisoner, Vladimir Antonio Arevalo-Chavez, alias "Vampiro," according to recently unsealed court records. ..."
>
> "During the negotiations over the use of El Salvador's prison, Trump officials agreed to pay some $6 million to house the deported men and acceded to an additional demand.
>
> "Bukele had one specific request, according to Milena Mayorga, his ambassador to the United States.
>
> " 'I want you to send me the gang leaders who are in the United States,' she quoted Bukele as telling U.S. Secretary of State Marco Rubio." Id.

Note also that each of these press reports, cited here to show the unstated motive for moving to dismiss the criminal indictment, also provides additional evidence of the conditions in the prisons in El Salvador – especially, but not only, of CECOT[8] – which amount to torture.

In short, we submit that "the real reason" for the motion to dismiss this indictment, as it was in the case of Cesar Lopez Larios, has nothing to do with justice, either for the United States or for our client, and has everything to do with politics. Just as in the Eric Adams case, the motives behind moving to dismiss the indictment are political. Simply put, our government wants a place to send deportees who can't be returned to their home counties (particularly Venezuela)

---

[8] See article in *The New Yorker*, supra (footnote 3), which, in discussing another prison called "Zacatraz" notes: "(While much attention is now being paid to the miseries of CECOT, conditions are even worse in the country's other prisons, where most incarcerated Salvadorans are kept.)"

-14-

where, instead of being released into the country of removal they will be held indefinitely in a horrific prison, and to do so is making a deal to dismiss a case so that this defendant – and no doubt others – can be sent to El Salvador to be silenced by the Bukele administration so that they will not provide politically damaging information and testimony against Bukele.

We submit that if this is the basis for the motion to dismiss this amounts to bad faith, and the dismissal should be with prejudice.

PART II

Defendant's Request for a Delay in the Entry or Effective Date
of the Dismissal Order

The second part of our application is our request to delay entry of a dismissal order to give us sufficient time to file a writ of habeas corpus in order to make sure our client is put into immigration proceedings so that he can assert his claims pursuant to Article III of the *United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Dec.10 1984, 1465 U.N.T.S. 85 , and the Immigration and Nationality Act, 8 U.S.C. § 1101, 1158, 1231(b)(3), and 8 CFR § 208.16 and § 208.18.

It is clear through several of the highly-publicized lawsuits relating to the removal of undocumented immigrants that the Trump administration cannot be counted on to follow the normal removal procedures as required by statutes, regulations, and the treaty (the Convention Against Torture). For that reason we seek a few days (up to a week, depending on which days turn out to be the days following any entry of a dismissal order by this Court) to finalize and file a writ, and to have the judge assigned to hear the writ rule on an emergency stay of removal application as well as applications to have our client remain in the New York area while his rights under the immigration laws are being pursued.

As noted previously, a similar request was made in the Eastern District of Virginia and was granted to the extent that the Court there ordered, with respect to the dismissal of the complaint (no indictment had been filed yet), as follows:

"**ORDERED** that the entry of the dismissal of the criminal complaint

against the Defendant is **STAYED** until 10:00am ET on Friday, April 18, 2025 [which was three days after the Order was entered] to permit Defendant to appeal this Order or pursue other remedies; and it is further

"**ORDERED** that the Defendant shall remain in the custody of the United States Marshal until 10:00am ET on Friday, April 18, 2025; and it is further

"**ORDERED** that the Defendant may not be transferred to the custody of the Department of Homeland Security before 10:00am ET on Friday, April 18, 2025."   (Full document attached as Exhibit A to our submission of April 23, 2025, ECF#167).

We would first point out that even though the defendant has never been to the United States until he was forcibly shuttled here (to Texas) by Mexican law enforcement working with U.S. law enforcement, he still has a right to seek relief from removal to a country where he might face persecution, torture, or death. He may be able to apply for asylum pursuant to 8 U.S.C. § 1158(a)(1) or withholding of removal pursuant to 8 U.S.C. § 1231(b)(3).

Even if he were not eligible for those two forms of relief from removal, he is certainly eligible for relief under the Convention Against Torture (*supra*). There are two procedures for evaluating the non-citizen's rights under CAT depending on whether he is in immigration court removal proceedings or whether he is being removed pursuant to the laws providing for "expedited removal," but both of them provide for an immigration judge to make a final review of the non-citizen's right to withholding of removal from any country where it is "more likely than not" that he will be tortured or killed at the hands of, or with the acquiescence of ("turning a blind eye), of the government of the country to which he would be removed.

Treaties have the force of law, just as a statute does. See U.S. Constitution, Supremacy Clause (Article VI, Clause 2).

Under expedited removal proceeding any non-citizen in the United States who can be subject of "expedited" removal proceedings who expresses a fear of being removed to a country where he would be persecuted or tortured is entitled

-16-

initially to an interview and evaluation by an immigration officer. See 8 U.S.C. § 1225(b)(1)(A)(ii).

If the asylum officer finds that there is a "significant possibility" that the non-citizen is entitled to relief the case is referred to an immigration judge for a full asylum or CAT-only hearing (with the issuance of a Notice to Appear). See 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. §§ 208.16(a), (c)(4), 1240.17(f)(2)(i)(B), and 1208.30(g)(2)(iv)(B).

If the asylum officer finds that there is insufficient reason to believe that the non-citizen is entitled to relief, the case is still reviewed (in a more limited proceeding) by an immigration judge, who, if he or she overrules the determination of the asylum officer, will refer for a full asylum or CAT-only hearing in immigration court, and if not, will order removal. 8 C.F.R. §§ 208.14(c)(1), and 1240.17(a). Even then, the non-citizen has a right to request reconsideration by USCIS of the negative determination. 8 C.F.R. § 208.30(g)(1)(I).

Because all of this can take some time it is imperative that Mr. Arevalo-Chavez not be removed to El Salvador before the procedures are completed. It would also severely hamper Mr. Arevalo's rights if he were moved to some other part of the country where he might (as has been shown in other recent cases) be unable to contact his attorneys or to assert his rights in the appropriate forum (either with an asylum officer or in immigration court) as set out in the description of the procedures above.

Press coverage of cases brought in federal district courts to preserve the rights and due process of non-citizens being removed show a pattern of the current administration of ignoring court orders, interpreting them in an unreasonable manner, and making efforts to race to remove people before they can assert their rights or before a district court can order that their right to due process be applied. See, for example, *A.A.R.P. v. Trump*, (N.D. Texas, 4/16/2025), 25 cv 59 (H), where after giving only 24 hours notice to detainees, in English, of their right to seek relief from removal, they were whisked away to an airport and were only prevented from being put on airplanes to El Salvador by the quick action of the A.C.L.U. in seeking a writ of habeas corpus at all three levels of the federal courts. *See, also*, the history of the case from the District of Columbia which ended up in

-17-

the U.S. Supreme Court after the government ignored an order by District Judge Boasberg to halt the removal of Venezuelans and to turn the airplane around to return to the United States. *J.G.G. v. Trump*, 25-cv-00766-JEB (D.D.C,, 2025). See also, the *per curiam* decision in *Trump v. J.G.G.*, 604 U.S. __, (2025), Case No. 24A931 (April 7, 2025), where the U.S. Supreme Court (which vacated TRO's issued by the District Court and confirmed by the Court of Appeals solely on the ground that the District of Columbia was the wrong jurisdiction for bringing the habeas applications) stated clearly that non-citizens are entitled to due process before being removed from the United States. In other cases the administration has raced to get migrants out of the United States before their attorneys could get restraining orders from courts, including the one involving eight migrants who were being sent to South Sudan after being given only 24 hours notice of their removal and no ability to contest it. See, *D.V.D. et al v. U.S. Department of Homeland Security et al*, 25-cv-10676 (BEM), filed 3/23/2025.

Finally, the case of Kilmar Abrego Garcia, where the Trump administration refused to take the steps required by the U.S. Supreme Court to "facilitate" the return of the wrongly-deported man (and Salvadoran President Bukele made fun of the Supreme Court's order) until the administration changed course and caused his return because they decided he could be prosecuted for crimes allegedly committed in Tennessee. See *Noem v. Abrego Garcia,* U.S. Supreme Court, 604 U.S. __ (4/10/2025), Case No. 24a949.

On behalf of our client, we want to be certain that he will have the opportunity to raise his strong claim of the likelihood that if removed to El Salvador he will be tortured or killed in prison.

Conclusion

We respectfully ask the Court to grant the government's motion only to the extent that the indictment against Mr. Arevalo-Chavez be dismissed with prejudice, on the grounds that the unstated motive behind the motion reveals "bad faith" in four respects: 1) the government knows that the defendant already was tried, convicted, and sentenced *in absentia* and thus will not, as the request suggests, be "tried" in El Salvador, 2) the government is aware that prosecutions in El Salvador of alleged gang members do not meet universally-accepted standards of due process based on our own State Department reports on human rights conditions in El Salvador, 3) the government knows that it is highly likely

that the defendant will be tortured or "disappeared" in the prison system of El Salvador, based on a well-documented history of torture of inmates and the motive the Salvadoran President has to silence him, and 4) that the motion is actually the product of an arrangement between the government of El Salvador and the Trump administration to return the alleged gang members who have damaging information about President Bukele in return for El Salvador accepting deportees from Venezuela and other countries even though the deportees have no connection with El Salvador and are likely to be incarcerated indefinitely.

  We also respectfully ask that after the dismissal order is issued that we have a few days before the effective date of the order so that we can file a writ of habeas corpus in an effort to ensure that Mr. Arevalo-Chavez receives due process in the removal process, and is not simply shipped off to El Salvador to face likely torture and possible death without his being able to assert his rights under Article III of the Convention Against Torture and our immigration laws and regulations.

          Respectfully submitted,

          */s/ Louis M. Freeman*
          Louis M. Freeman

          */s/ Thomas H. Nooter*
          Thomas H. Nooter
          Attorneys for Defendant Arevalo-Chavez