FILED
CLERK

7/16/2025 11:15 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

    - against -

VLADIMIR ANTONIO AREVALO-CHAVEZ
       also known as "Vampiro de Monserrat
       Criminales," *et al.*,

                Defendants.
-----------------------------------------------------------------X

**MEMORANDUM &
ORDER**
22-CR-429 (JMA)(AYS)

**AZRACK, United States District Judge:**

      In two cases before the Court, the Government brought charges against 27 alleged leaders of MS-13. (Arevalo-Chavez Indictment, United States v. Arevalo Chavez, Case No. 22-CR-429, ECF No. 18; Henriquez Indictment, United States v. Henriquez, Case No. 20-CR-577, ECF No. 1.[1]) Currently pending is a motion by the Government to dismiss the indictment against one of the defendants, Vladimir Antonio Arevalo-Chavez, without prejudice pursuant to Federal Rule of Criminal Procedure 48. (ECF No. 155.) All 13 defendants named in the Arevalo-Chavez Indictment are charged with conspiring to provide material support to terrorists and conspiring to commit Racketeering, Narco-Terrorism, and Alien Smuggling.

      Recently, on March 17, 2025, Francisco Javier Roman-Bardales—another defendant in this case—was arrested in Mexico and sent to the United States. Hailing the arrest, Attorney General Pam Bondi and the Department of Justice told the public that Roman-Bardales would be prosecuted "in a courtroom on Long Island where his transnational criminal organization has impacted so many communities" and that MS-13 members would face "swift American justice for

---

[1] Unless otherwise noted, all record citations are to the Arevalo-Chavez docket, Case No. 22-cr-429.

their heinous crimes."[2]

Despite these public pronouncements, less than two weeks later, the Government filed a motion to dismiss the charges against Arevalo-Chavez. The Government filed the motion under seal and asked the Court to dismiss the charges against Arevalo-Chavez (and for him to be sent to El Salvador) before the public would have a chance to see the motion. Such a course would prove legally impermissible. The public has a right under the First Amendment to know about this motion unless the Government has identified an overriding compelling interest that warrants sealing. The Government failed to do so here. A desire to avoid public scrutiny of a decision to seek dismissal of criminal charges does not justify sealing. In this case, the Government appears to be making inconsistent representations and the public has a right to know about this motion before its resolution.

The Court previously directed, in a brief order, that the filings for this motion to dismiss be unsealed and indicated that an opinion explaining its unsealing decision would be forthcoming. (ECF No. 176.) The Court's reasoning is set out herein.

For over three years, the U.S. Government's attempts to extradite MS-13 leaders being held in El Salvador were rebuffed by the government of El Salvador. Not only did the government of El Salvador refuse to extradite these defendants, but, according to the U.S. Government, El Salvador actually released a number of these defendants from its custody. Recently, however, the U.S. Government has seemingly reversed course. After the government of El Salvador publicly requested, in February, that the alleged MS-13 leaders in U.S. custody be sent to El Salvador, the U.S. Government has now sought dismissal of charges against two defendants in order to remove

---

[2] Press Release, U.S. Attorney's Office, Eastern District of New York, *High-Ranking MS-13 Leader Arraigned in Long Island Federal Court on Terrorism and Racketeering Charges After His Arrest in Mexico* (Mar. 19, 2025) ("Mar. 19 Press Release"), available at https://www.justice.gov/usao-edny/pr/high-ranking-ms-13-leader-arraigned-long-island-federal-court-terrorism-and; https://perma.cc/P5LE-T8E6.

them to El Salvador. This is occurring in the context of cases where, as detailed below, the indictments allege extraordinary relationships between MS-13 leaders and the Salvadoran government.

The Government maintains that this Court must grant the Government's motion to dismiss without prejudice. The Court does not address the merits of the Government's motion to dismiss here. However, with respect to the discrete question of sealing, it would have been inappropriate— given the facts of this case, the purpose of Rule 48, and the public's right to access judicial documents and proceedings—for this Court to unseal the motion only after it had been ruled on. Continued sealing was not warranted as this case involves issues of significant public interest and the reasons proffered by the Government were not sufficient to justify sealing here.

## I. BACKGROUND

MS-13, which began as a Central American street gang in Southern California in the 1980s, has grown into a transnational criminal organization with tens of thousands of members worldwide. (Arevalo Chavez Indictment ¶¶ 1–4; Henriquez Indictment ¶¶ 1–5.) According to the indictments, in addition to committing violence against civilians and government officials in El Salvador, MS-13's leaders allegedly directed its large membership in the United States to engage in criminal activities such as drug trafficking, extortion, alien smuggling, and acts of violence, including murder.[3] Both indictments also allege extraordinary and corrupt relationships between these MS-13 leaders and high-ranking officials of the Salvadoran Government.

---

[3] All defendants are, of course, entitled to the presumption of innocence. In this opinion, which concerns the Court's decision to unseal various filings, the Court references the allegations in these indictments, other court records, various public statements made by government officials, and press articles related to this case. This information is relevant to the Court's determination to unseal certain filings. However, the indictment and other statements made by the Government are only allegations and each of the defendants is entitled to the presumption of innocence. To be convicted, the Government must prove, at trial, that a defendant is guilty beyond a reasonable doubt.

MS-13 has committed crimes across El Salvador, Mexico, and the United States, with countless victims within the jurisdiction of this Court.  The U.S. Attorney's Office for the Eastern District of New York has prosecuted hundreds of MS-13 leaders, members, and associates in connection with more than 80 killings in the Eastern District of New York since 2009.  (Mar. 19 Press Release.)  These victims included rival gang members, innocent individuals incorrectly suspected of being rival gang members, and MS-13 members suspected of cooperating with law enforcement authorities.  (20-CR-577, ECF No. 36 at 4.)  According to the Government, a "full count of the number of deaths in the United States caused by MS-13 is, impossible, as victims of their violence include undocumented immigrants whose bodies have never been recovered."  (Id.)

A.  **The Establishment of Joint Task Force Vulcan and the Henriquez Indictment**

"In 2017, the President directed the Department of Justice to go to war against MS-13." (Press Release, Dep't of Justice, *The Department of Justice Announces Takedown of Key MS-13 Criminal Leadership* (July 15, 2020).[4])  In August 2019, the Trump Administration launched "Joint Task Force Vulcan (JTFV), an initiative . . . aimed at disrupting, dismantling, and ultimately, destroying MS-13."  Id.  Commenting on Joint Task Force Vulcan in July 2020, President Trump stated that "[t]here's never been any move like this before" and that "[m]y Administration will not rest until every member of MS-13 is brought to justice."  (*The Terrorism Suspect Trump Sent Back to Bukele*, THE NEW YORKER (Apr. 18, 2025) ("Apr. 18 New Yorker Article").[5])  Joint Task Force Vulcan subsequently obtained both the indictments pending before this Court.

In December 2020, a grand jury returned the Henriquez Indictment against 14 defendants, whom the indictment alleges to be members of the *Ranfla Nacional*, the "highest level of

---

[4] Available at https://www.justice.gov/archives/opa/pr/department-justice-announces-takedown-key-ms-13-criminal-leadership; https://perma.cc/6EWC-SDW9

[5] Available at https://www.newyorker.com/news/the-lede/the-terrorism-suspect-trump-sent-back-to-bukele

leadership in MS-13," which "provided overall direction for the gang" and acted as the "equivalent of a 'board of directors.'" (Henriquez Indictment ¶ 6.) Upon its unsealing on January 14, 2021, this indictment was hailed by the Department of Justice as the culmination of Attorney General Barr's efforts "designed specifically to eliminate MS-13 leadership's ability to operate the gang and direct its terrorist activity," which were "consistent with President Trump's Executive Order and the Attorney General's whole of government approach." (Press Release, U.S. Attorney's Office, Eastern District of New York, *MS-13's Highest-Ranking Leaders Charged with Terrorism Offenses in the United States* (Jan. 14, 2021).[6])

Defendant Borromeo Enrique Henriquez is, according to the Government, "widely recognized as the most powerful member of the *Ranfla Nacional*." (20-CR-577, ECF No. 19 at 1 n.1.) Other defendants in the Henriquez case include Elmer Canales-Rivera, Fredy Ivan Jandres-Parada, and Cesar Humberto Lopez-Larios. (Henriquez Indictment.)

The Henriquez Indictment charges the defendants with, among other things, conspiring to commit Narco-Terrorism and transnational terrorism. According to the indictment, the *Ranfla Nacional* authorized MS-13 members to commit murders in the United States. (Id. ¶ 47(e)-(g).) The indictment alleges, amongst numerous other criminal acts, that the *Ranfla Nacional* also ordered the murder of an FBI special agent assigned in El Salvador. (Id. ¶ 47(d).)

The Henriquez indictment also explained that the *Ranfla Nacional* had gained political influence in El Salvador through the violence and intimidation that MS-13 exerted on El Salvador's government and civilian population. According to the indictment, beginning in 2012, the *Ranfla Nacional* engaged in secret negotiations with the ruling party in El Salvador, the *Farabundo Marti National Liberation Front* ("*FMLN*"), as well as MS-13's principal rival gang concerning a "truce"

---

[6] Available at https://www.justice.gov/usao-edny/pr/ms-13-s-highest-ranking-leaders-charged-terrorism-offenses-united-states; https://perma.cc/S3TE-T4JF

in which the gangs would reduce homicides in exchange for improved prison conditions, benefits and money. (Id. ¶ 23.) When this "truce" terminated in 2015, the *Ranfla Nacional* allegedly blamed the United States for pressuring the government of El Salvador and, as a result, directed an increase of violence and murders in the United States. (Id. ¶¶ 23, 47.) The Henriquez Indictment also alleged, with little elaboration, that, after this "truce" ended in 2015, the "*Ranfla Nacional* continued to negotiate with political parties in El Salvador and to use its control of the level of violence to influence the actions of the government in El Salvador," and that the *Ranfla Nacional*'s goals included "supporting specific political parties in Salvadoran elections with the purpose of obtaining benefits in return when members of such parties took office." (Id. ¶¶ 26, 46.)

## B. Events Following the Henriquez Indictment

After the Henriquez Indictment was unsealed in January 2021, the case remained idle for almost three years as none of the defendants were in United States custody.

On April 22, 2022, the Government updated the Court on its efforts to extradite twelve of the defendants—including Canales-Rivera—who were in the custody of El Salvador. (20-cr-577, ECF No. 18.) Citing "numerous media outlets in El Salvador," including El Faro, the Government informed the Court that, despite pending extradition requests from the United States and the lodging of INTERPOL Red Notices against these defendants, the government of El Salvador had released four of the indicted defendants from custody, including Canales-Rivera. (Id. at 2.)

In March 2022—a month before the Government's April 22, 2022 status letter—MS-13 began a three-day massacre in El Salvador, indiscriminately killing eighty-seven people. (Apr. 18 New Yorker Article.) In response to these killings, Salvadoran President Nayib Bukele "declared a state of exception, which is still in effect, suspending many of the country's due process rights

and commencing a wave of mass arrests."[7]  (Id.)  Since the declaration of the state of exception, El Salvador's murder rate—which was previously the highest in the world—has plummeted and El Salvador is reportedly now "safer than Canada."  (*El Salvador Offers to Take U.S. Deportees of Any Nationality Including Imprisoned Americans*, THE WALL STREET JOURNAL (Feb. 4, 2025) ("Feb. 4 WSJ Article").[8])

## C.  The Arevalo-Chavez Indictment

In September 2022, the Government obtained an indictment against Arevalo-Chavez and 12 other defendants, all alleged to be high-level leaders of MS-13.  (Arevalo-Chavez Indictment.) This indictment was unsealed in February 2023.

Four of these defendants, including Jose Wilfredo Ayala-Alcantara, are alleged to be part of the *Ranfla Nacional*.  (Id. ¶ 13.)  The other defendants—including Arevalo-Chavez, Roman-Bardales, Jorge Alexander De La Cruz, Walter Yovani Hernandez-Rivera, and Marlon Antonio Menjivar-Portillo—are allegedly part of high levels of MS-13's leadership below the *Ranlfa Nacional*.  (Id. ¶¶ 12, 13.)  The Arevalo-Chavez Indictment charges all the defendants with conspiring to provide material support to terrorists and conspiring to commit Racketeering, Narco-Terrorism, and Alien Smuggling.

The Arevalo-Chavez Indictment also expands on the allegations in Henriquez concerning MS-13's negotiations with the Salvadoran government.  The indictment alleges that the *Ranfla Nacional* negotiated with both the *FMLN* and its rival political party, including arrangements with "political candidates in exchange for benefits for MS-13 and the *Ranfla Nacional* themselves."

---

[7]  President Bukele was first elected as El Salvador's president in 2019.  Before his election as president, he was the mayor of San Salvador.  He belonged to the *FMLN* party, but split from it in 2017 and created a new party, *Nuevas Ideas*.  In 2024, he was re-elected as President.

[8]  Available at https://www.wsj.com/world/americas/el-salvador-offers-to-take-u-s-deportees-of-any-nationality-including-imprisoned-americans-37e8f643?reflink=desktopwebshare_permalink

(Id. ¶ 31.)  Arevalo-Chavez, Ayala-Alcantara, and De La Cruz allegedly "participated in the negotiations, including meeting with government officials, politicians, and non-governmental organizations inside and outside prison."  (Id.)

Although the "truce" between MS-13 and the Salvadoran government ended in 2015, the Arevalo-Chavez Indictment alleges that "the *Ranfla Nacional* continued to negotiate with the government and political parties in El Salvador as part of its efforts to maintain the power and influence of MS-13 and obtain benefits from the government of El Salvador, including without limitation negotiations in connection with the February 2019 El Salvador presidential election."  (Id. ¶ 35.)  De La Cruz is alleged to have been heavily involved in these negotiations.  (Id.)

According to the indictment, following the February 2019 presidential election in El Salvador, MS-13 leaders—including defendants Canales-Rivera and Henriquez—"secretly met numerous times with representatives of the government of El Salvador inside Zacatecoluca and Izalco prisons and elsewhere."  (Id. ¶ 33.)  Defendant De La Cruz allegedly helped "coordinate[]" these efforts.  (Id. ¶ 35.)  The indictment highlights the role of Salvadoran officials in arranging these meetings, including the "Director of *Centro Penales* (National Prisons) and the Director of *Tejido Social Reconstruccion* (Social Fabric Reconstruction)."  (Id.)

During these negotiations, the *Ranfla Nacional* allegedly negotiated for reduced prison sentences, "financial benefits, control of territory, [and] less restrictive prison conditions that would enable" the leaders of MS-13 to maintain control.  (Id. ¶ 36.)  According to the indictment, the "*Ranfla Nacional* [also] demanded that the government of El Salvador refuse to extradite MS-13 leaders, including the *Ranfla Nacional*, to the United States for prosecution."  (Id.)

8

In return, the leaders of MS-13 allegedly agreed to reduce the number of "public murders" in El Salvador to create a perception that the murder rate was decreasing, while at the same time continuing to authorize murders where the victims' bodies were buried or hidden.  (Id. ¶ 36.)

The indictment also alleges that, as part of the negotiations, the MS-13 leaders "agreed to use MS-13's political influence to direct MS-13 members, friends and relatives of members, and residents of neighborhoods under MS-13 control, to support *Nuevas Ideas* candidates in the 2021 elections for El Salvador's Legislative Assembly."  (Id. ¶ 36.)  Subsequently, in the February 2021 elections, the *Nuevas Ideas* party and its allies won a super-majority in the legislature.  (Id. ¶ 38.)

The Arevalo-Chavez Indictment also discusses the United States' unsuccessful efforts to extradite the Henriquez defendants.  According to the indictment, prior to the 2021 elections, the Attorney General for El Salvador had announced his support for the extradition of the *Ranfla Nacional* members to the United States.  (Id. ¶ 37.)  However, after the February 2021 election, the Attorney General was removed by the *Nuevas Ideas*-controlled Legislative Assembly.  (Id. ¶ 38.)  As mentioned earlier—and as recounted again in the Arevalo-Chavez Indictment—the government of El Salvador subsequently released Canales-Rivera from custody even though, at the time, there was a pending extradition request from the United States.  (Id. ¶ 39.)

**D.  Subsequent Events including the March 15, 2025 Flights to El Salvador and the Government's Motion to Dismiss Lopez-Larios**

On February 22, 2023, Arevalo-Chavez, Hernandez-Rivera, and Menjivar-Portillo were apprehended in Mexico, expelled to the United States, and arrested at the airport in Houston, Texas.  (ECF No. 16.)  On February 23, 2023, the Government moved to unseal the Arevalo-Chavez Indictment to facilitate the defendants' initial appearances in Texas, pending removal to the Eastern District of New York.  (Id.)  Later that day, the defendants appeared in open court before a magistrate judge in Texas.  (United States v. Arevalo-Chavez, Case No. 4:23-mj-346 (S.D.

Tex.).)  Because Arevalo-Chavez did not waive his right to an identity hearing, the magistrate judge scheduled, on the public docket, a hearing for February 28, 2023.  (4:23-mj-346, ECF No. 16.)  The hearing was held and Arevalo-Chavez was ordered removed to the Eastern District of New York.  (4:23-mj-346, Feb. 28, 2023 Minute Entry; Order, ECF No. 20.)

Arevalo-Chavez was transferred to New York, and all three defendants were arraigned, in open court, in the Eastern District on March 15, 2023.  (ECF No. 24.)  Arevalo-Chavez would subsequently appear at seven publicly-noticed conferences between July 2023 and April 1, 2025.

In November 2023, Canales-Rivera was apprehended in Mexico.   (20-CR-577, ECF No. 19.)  In the Government's letter seeking his continued detention, the Government provided further details about his release from Salvadoran custody, explaining that:

> The evidence at trial will establish that that CANALES-RIVERA was escorted from a prison by high-level Salvadoran government officials, housed in a luxury apartment and other locations, provided with a firearm, and then driven to the Guatemalan border, where arrangements were made with a human trafficker to illegally smuggle CANALES-RIVERA into Guatemala.

(Id. at 1–2.)  While the Government's April 2022 status report had relied on news reports from Salvadoran news organizations such as El Faro, the Government's November 2023 detention letter indicates the Government possesses evidence that confirms those press reports.

As of January 1, 2025, eight defendants from these two indictments were in U.S. custody: Canales-Rivera, Jandres-Parada, and Lopez-Larios from the Henriquez Indictment; and Arevalo-Chavez, Ayala-Alcantara, De La Cruz, Hernandez-Rivera, and Menjivar-Portillo from the Arevalo-Chavez Indictment.

In February 2025, Secretary of State Marco Rubio met with President Bukele.  (Feb. 4 WSJ Article.)  After the meeting, Secretary Rubio announced that President Bukele offered to "house,"

in Salvadoran prisons, "American criminals" and any "illegal immigrant in the United States who's a dangerous criminal," including members of MS-13 and Tren de Aragua ("TdA"). (Id.)

The next day, El Salvador's ambassador to the United States stated, during a televised interview, that President Bukele had told Secretary Rubio that he wants the MS-13 leaders in U.S. custody to be sent to El Salvador. (See *Offering US His Torture Prisons, Bukele Wants MS-13 Leaders Back*, EL FARO (Feb. 6, 2025)[9]; *El Salvador's President Sees Opportunity in Trump's Deportations*, THE NEW YORK TIMES (Mar. 17, 2025) ("Mar. 17 N.Y. Times Article")[10]; *Why Bukele Opened His Infamous Prison to Trump*, THE WASHINGTON POST (Mar. 20, 2025) ("Mar. 20 Washington Post Article")[11]; *'El Greñas,' the MS-13 Leader Who May Hold the Key to Bukele and Trump's Prison Deal*, EL PAÌS (Mar. 24, 2025) ("Mar. 24 El Païs Article").[12]

On March 11, 2025, in the Henriquez case, the Government filed a motion to dismiss the indictment against Lopez-Larios without prejudice. (20-CR-577, ECF No. 92.) Citing "geopolitical and national security concerns of the United States, and the sovereign authority of the Executive Branch in international affairs," the Government asserted that it sought dismissal of these charges so that "El Salvador can proceed first with its criminal charges against [Lopez-Larios] under Salvadoran law." (Id. at 2.)

The Government filed the motion under seal and requested that its motion "be kept under seal given significant operational concerns, including the safety of the officers transferring the

---

[9]  Available at https://elfaro.net/en/202502/el_salvador/27734/offering-us-his-torture-prisons-bukele-wants-ms-13-leaders-back; https://perma.cc/BP5C-BUHC

[10]  Available at https://www.nytimes.com/2025/03/17/world/americas/el-salvador-nayib-bukele-deportees.html

[11]  Available at https://www.washingtonpost.com/world/2025/03/20/bukele-salvador-trump-prison/

[12]  Available at https://english.elpais.com/international/2025-03-24/el-grenas-the-ms-13-leader-who-may-hold-the-key-to-bukele-and-trumps-prison-deal.html; https://perma.cc/8JSW-EYKB

defendant." (Id. at 3.)  The Government also asserted that "public disclosure of this motion before that date could cause harm to the government's relationship with a foreign ally." (Id.)

The Court granted the motion to dismiss on March 11, 2025 and, pursuant to the Government's request, kept the motion and the Court's order under seal.  On March 12, 2025, the Court ordered the Government to show cause why the motion should not be unsealed once the transfer of Lopez-Larios was complete.  (20-CR-577, Mar. 12 Order.)

On March 14, President Trump signed a Presidential Proclamation invoking the Alien Enemies Act ("AEA"), 50 U.S.C. § 21, and declaring members of TdA to be Alien Enemies.  (See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, White House (Mar. 15, 2025)[13]; 90 Fed. Reg. 13033 (Mar. 14, 2025).)

On Saturday March 15, 2025, shortly after the AEA Proclamation was made public, the Government sent, on three flights, hundreds of individuals to El Salvador, including Lopez-Larios, other Salvadorans alleged to be members of MS-13, and 238 Venezuelans alleged to be members of TdA.  (See *The Latin American Leader Helping Trump Deport Venezuelans*, THE WALL STREET JOURNAL (Mar. 18, 2025.[14])  The removal of 137 Venezuelans pursuant to the AEA and others on these flights—as well as the Government's continuing attempts to use the AEA—have been challenged in well-publicized and ongoing litigation that has gone up to the Supreme Court.[15]  See

---

[13] Available at https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/; https://perma.cc/R74Z-5JZ8

[14] Available at https://www.wsj.com/world/americas/the-latin-american-leader-helping-trump-deport-venezuelans-0e85f7a3?reflink=desktopwebshare_permalink

[15] On March 15, Judge James E. Boasberg held an emergency hearing to address challenges to the attempted removals under the AEA.  See J.G.G. v. Trump, No. 25-CV-766, 2025 WL 1119481, at *1 (D.D.C. Apr. 16, 2025).  137 of the Venezuelans were ultimately removed on March 15 pursuant to the AEA—in alleged defiance of orders from Judge Boasberg—and are now imprisoned in El Salvador.  (See *White House Official Says 137 Immigrants Deported Under Alien Enemies Act*, WASHINGTON POST (Mar. 16, 2025), available at https://www.washingtonpost.com/immigration/2025/03/16/alien-enemies-act-venezuela-el-salvador-prison/.)

<u>Trump v. J.G.G.</u>, 145 S.Ct. 1003 (Apr. 7, 2025); <u>J.G.G. v. Trump</u>, No. 25-CV-766, 2025 WL 1119481 (D.D.C. Apr. 16, 2025); <u>J.G.G. v. Trump</u>, No. 25-CV-766, 2025 WL 1577811 (D.D.C. June 4, 2025); <u>see also</u> <u>A.A.R.P. v. Trump</u>, 145 S. Ct. 1364 (May 16, 2025).

On the morning of March 16, President Bukele tweeted about the flights on the social media platform X, including posting a video that showed Lopez-Larios, who identified himself by name on camera. (Nayib Bukele, @nayibbukele, X (Mar. 16, 2025 8:13 AM).[16]) Secretary Rubio also tweeted on X about the flights that morning. (Marco Rubio, @SecRubio, X (Mar. 16, 2025 7:59 AM.[17]) In their tweets, both Secretary Rubio and President Bukele publicly announced that the United States had sent 23 members of MS-13 to El Salvador, including, according to President Bukele, two "ringleaders," one of whom was a member of MS-13's "highest structure." (<u>Id.</u>; Nayib Bukele, @nayibbukele, X (Mar. 16, 2025 8:13 AM).)

Later on March 16, the Government filed a response to this Court's March 12 Order to Show Cause in which the Government requested that the Court continue the sealing of the filings concerning Lopez-Larios until at least March 17, 2025 when the Government indicated it would provide a further status update. (20-CR-577, ECF No. 94.) The Government now asserted that the "operational concerns" that necessitated sealing "extended far beyond the defendant Cesar Lopez-Larios" as "[i]t is the government's understanding that the operation involves not just the Department of Justice, but multiple components from the Department of Homeland Security and other agencies, numerous subjects, and that the operation is on-going and incomplete." (<u>Id.</u>) According to the letter, "the government has been specifically directed by Department of Justice leadership to request that the Sealed Documents remain under seal until the operation is complete

---

[16] Available at https://x.com/nayibbukele/status/1901245427216978290?lang=en

[17] Available at https://x.com/SecRubio/status/1901241933302825470

or as otherwise directed because the disclosure of the details in those documents could compromise the operation and officer safety." (Id.)  Later that day, the Court unsealed the filings concerning the motion to dismiss.[18]  (20-CR-577, Mar. 16, 2025 Order.)

A few days later, there were additional developments in the Arevalo-Chavez case.  On March 18 and March 19, defendants De La Cruz and Menjivar-Portillo pled guilty to the first three counts in the indictment.  (ECF Nos. 140, 141.)

On March 19, defendant Roman-Bardales—who was arrested in Mexico two days earlier and immediately sent to U.S. custody—was arraigned on the Arevalo-Chavez Indictment.  (ECF No. 142; Mar. 19 Press Release.)  In conjunction with Roman-Bardales's arrest, Attorney General Pam Bondi and the Department of Justice announced that he would be prosecuted "in a courtroom on Long Island where his transnational criminal organization has impacted so many communities" and that MS-13 members would face "swift American justice for their heinous crimes."  (Mar. 19 Press Release.)  This press release also recounted some of the criminal acts alleged in the indictment, including violent terrorist activities, public displays of violence to intimidate civilian populations, using violence to control territory, and manipulating the electoral process in El Salvador.  (Id.)

The March 15 flights to El Salvador were covered extensively in the press.  A number of these articles published between March 16 and the end of the month discussed the two MS-13 indictments before this Court, Lopez-Larios's dismissal, and President Bukele's requests for the alleged leaders of MS-13 in U.S. custody.  (See Mar. 17 N.Y. Times Article; *US Deports MS-13*

---

[18]  The Government has not subsequently asserted that the Court's March 16 unsealing order compromised any operational security or officer safety.

*Leader to El Salvador with Alleged Members of Tren de Aragua*, EL FARO (Mar. 17, 2025)[19]; Mar. 20 Washington Post Article; *'Historical Loss': Alleged Gang Leader Evades US Justice with Deportation to El Salvador*, CNN (March 24, 2025)[20]; Mar. 24 El Paìs Article.)

### E.  The Government's Motion to Dismiss Arevalo-Chavez

On April 1, 2025, Arevalo-Chavez and two other defendants appeared in court for a status conference, at which they waived Speedy Trial time through September 3, 2025.  (ECF No. 154.)

Later that day, the Government filed the instant motion to dismiss, under seal, that seeks dismissal of the charges against Arevalo-Chavez without prejudice.  (ECF No. 155.)  This motion to dismiss—which is almost identical to the motion to dismiss Lopez-Larios—states that, based on "geopolitical and national security concerns of the United States, and the sovereign authority of the Executive Branch in international affairs," the Government is seeking dismissal of the charges against Arevalo-Chavez "so that El Salvador can proceed first with its criminal charges against [him] under Salvadoran law."  (Id. at 1–2.)  With respect to sealing, the Government stated that:

> [A]s directed by Department of Justice leadership, the government respectfully requests that this letter be kept under seal, given significant operational concerns, including the safety of the officers transferring the defendant and others.  Further, public disclosure of this motion before the operation is complete could cause harm to the government's relationship with a foreign ally.

(Id. at 3.)  The Government maintained that its sealing request was "narrowly tailored and appropriately balances the government's compelling interests with the public's qualified right to access this document."  (Id.)  At the time, Arevalo-Chavez's counsel consented to the sealing.  (Id.)

---

[19] Available at https://elfaro.net/en/202503/el_salvador/27780/us-deports-ms-13-leader-to-el-salvador-with-alleged-members-of-tren-de-aragua.htm; https://perma.cc/8V3W-452T

[20]  Available at https://www.cnn.com/2025/03/24/politics/ms-13-leader-deported-el-salvador-boasberg-order; https://perma.cc/3YWQ-MUD7

Arevalo-Chavez was granted an extension of time until April 23, 2025 to respond to the motion to dismiss.  (Apr. 11, 2025 Order.)  While awaiting his response, on April 14, 2025, the Court directed both parties to show cause to why filings concerning the motion to dismiss should not be unsealed and available on the public docket and why any future proceedings concerning the motion should not be held in open court.  (Apr. 14, 2025 Order.)

The Government's response to the Order to Show Cause reiterated, with little further elaboration, that the motion to dismiss should continue to be litigated under seal due to foreign policy concerns and because "premature disclosure of these filings potentially could have a dangerous and disruptive effect on operational security."  (ECF No. 165.)  The Government contended that this request was narrowly tailored because it was "seeking the continued sealing only until the operation is complete, at which point all filed materials will be made public."  (Id. at 2.)  Arevalo-Chavez responded that there was "no compelling argument for maintaining these documents under seal."  (ECF No. 166.)

The parties subsequently submitted additional filings under seal concerning the motion to dismiss.  On April 23, 2025, Arevalo-Chavez filed his response to the motion to dismiss, which requested:  (1) discovery and a hearing concerning the reasons for the dismissal and whether the Government's request was made in bad faith; (2) dismissal of the indictment with prejudice; and (3) delayed entry of any order of dismissal so that Arevalo-Chavez—who is a Salvadoran citizen—can file a petition of habeas corpus to ensure that, prior to his removal, he has an opportunity to seek relief based on his fear that he will be tortured in El Salvador.  (ECF No. 167.)

In the Government's April 30, 2025 reply letter, the Government discussed, for the first time, the specific charges that have been brought against Arevalo-Chavez in El Salvador.  (ECF No. 170.)  The Government's April 30 letter also asserted that sealing was warranted because—in

addition to the bases for sealing previously asserted by the Government—the Government's letter discussed "the details of charges pending against the defendant" in El Salvador, "which <u>may</u> not have been made public there." (<u>Id.</u> at 4 (emphasis added).) The Government indicated that it had "requested copies of the Salvadoran charging instruments and arrest warrants, and will provide these to counsel and the court once received." (<u>Id.</u> at 2 n.2.) The next day, the Court directed the Government to provide these documents once they had been received. (May 1, 2025 Order.)

On May 14, 2025, the Government filed a response that included three exhibits–an INTERPOL Red Notice and two arrest warrants.[21] (ECF No. 173.) The Government's May 14 letter disclosed, for the first time, that one of the Salvadoran arrest warrants for Arevalo-Chavez stemmed from two charges (Illicit Associations and Aggravated Homicide) for which Arevalo-Chavez had already been tried and sentenced, in absentia, to sentences of 14 years and 25 years, respectively. (<u>Id.</u>) The Government represented that the other outstanding arrest warrant was for an open charge of "Terrorist Organizations." (<u>Id.</u>) The exhibits provided by the Government, however, were all in Spanish and a partial "draft translation" was provided for only one of the documents. (<u>Id.</u>) The next day, the Court directed the Government to provide complete certified translations of all documents that were in Spanish. (May 15, 2025 Order.) On May 20, 2025, the Government provided the Court with certified English-language translations of the exhibits.

---

[21] In its May 14, 2025 letter, the Government indicated that it had attempted to obtain additional documents, such as the actual charging instruments that were referenced in the Government's April 30 letter. (ECF No. 173.) However, the Government informed the Court that it was unable to provide those documents because the government of El Salvador was requiring that the United States submit "a formal request pursuant to the Mutual Legal Assistance Treaty ("MLAT")" for the documents. (<u>Id.</u>) In the May 14 letter, the Government asserted that "this cumbersome and extremely lengthy procedure would take an exorbitant amount of time" and that these materials are not necessary for the Court to decide the motion to dismiss. (<u>Id.</u>)

**F.  Additional Press Reports During the Pendency of the Motion to Dismiss**

While the parties were briefing the Government's motion to dismiss, and submitting the various filings under seal set out above, there was further press coverage concerning matters related to this case, including the dismissal of Lopez-Larios's charges, El Salvador's requests for the MS-13 leaders in U.S. custody, and El Salvador's earlier decisions to release defendants from custody who the U.S. had sought to extradite.  (See, e.g., *Does Bukele Have a Pact With MS-13?*, THE WALL STREET JOURNAL (May 12, 2025)[22]; Apr. 18 New Yorker Article.)

One article described, in detail, purported negotiations between the U.S. Government and El Salvador concerning the March 15 flights and El Salvador's imprisonment of the Venezuelans alleged to be members of TdA.  (*Trump Admin Proposed Sending Up to 500 Alleged Venezuelan Gang Members During Negotiations to Use El Salvador's Mega-Prison*, CNN (Apr. 28, 2025) ("Apr. 28 CNN Article").[23])  Emails were reportedly exchanged between President Bukele's brother and Michael Needham—the counselor and chief of staff to Secretary Rubio—in the days leading up to the March 15 flights.  (Id.)  According to this article, one e-mail stated that El Salvador had requested nine specific MS-13 members and that, "[u]pon all nine being returned, (El Salvador) will provide (US government) a 50% discount for Year 2, if necessary, of the original TdAs."  (Id.)  At the time these emails were allegedly sent, eight defendants named in the two indictments before this Court were in U.S. custody and, as explained earlier, a ninth defendant, Roman-Bardales, was subsequently apprehended days later, on March 17, 2025.

---

[22] Available at https://www.wsj.com/opinion/does-bukele-have-a-pact-with-ms-13-two-american-indictments-allege-cooperation-e771f151?reflink=desktopwebshare_permalink

[23]  Available at https://www.cnn.com/2025/04/28/politics/trump-el-savador-prison-negotiations; https://perma.cc/M6UD-7FTW

Additionally, on April 30, 2025, the New York Times reported that although El Salvador had not yet received "everyone [President Bukele] sought, . . . U.S. officials say they still intend to send additional gang leaders he has requested." (*Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*, THE NEW YORK TIMES (Apr. 30, 2025) ("Apr. 30 N.Y. Times Article").[24])

## G.  The Court's Unsealing Order

On May 22, 2025, the Court unsealed many of the filings concerning the April 1, 2025 motion to dismiss.  That same day, the Court also issued, under seal, an order to show cause that directed the Government to explain why certain other filings—which referenced the specific charges against Arevalo-Chavez—should not also be unsealed.

On May 29, 2025, the Government responded, informing the Court that the arrest warrants and charges listed in its April 30 letter were, in fact, not under seal in El Salvador.  (ECF No. 178.) The attorneys for the Government stated that although they had sought clarity from the U.S. Embassy in San Salvador and the FBI about the status of these documents, they did not receive a definitive answer for almost a month.[25]  (Id. at 1 n.1)  In its May 29 response, the Government stated it had no objection to unsealing the letters filed at ECF Nos. 170, 173, 174, and 175, but submitted redacted versions of certain exhibits.[26]

---

[24]  Available at https://www.nytimes.com/2025/04/30/us/politics/trump-deportations-venezuela-el-salvador.html

[25]  While the Government's filings have demanded rapid action by the Court on the motion to dismiss, (ECF No. 178), it is notable that it took the Government almost a month to determine whether these warrants and charges were public.

[26]  In light of the above, the Clerk of Court is directed to unseal the letters filed at ECF Nos. 170, 173, 174, and 175. The Clerk of the Court, however, shall not unseal the exhibits attached to ECF Nos. 173 and 175.  The Government has provided redacted copies of the arrest warrants that redact certain personally identifiable information. Additionally, the Government has provided the publicly available extract of the INTERPOL Red Notice, which differs from the version of the Red Notice originally provided by the Government.  The Clerk of Court shall also unseal the Court's May 22, 2025 Order to Show Cause, ECF No. 177.

After the Court's May 22 unsealing order, there has been additional press coverage of these matters, including reporting concerning El Salvador's refusals to extradite the MS-13 leaders in its custody and the dismissal of Lopez-Larios.  ("*Delay, Interfere, Undermine:" How El Salvador's Government Impeded a U.S. Probe of MS-13*, PROPUBLICA (June 12, 2025)[27]; *The Gang-Linked Prison Chief Taking Custody of Trump's Deportees*, THE WALL STREET JOURNAL (May 22, 2025)[28]; *Trump Vowed to Dismantle MS-13. His Deal With Bukele Threatens That Effort,* THE NEW YORK TIMES (JUNE 30, 2025)[29]; *Trump DOJ Drops Cases Against Top MS-13 Leaders*, NATIONAL REVIEW (July 5, 2025)[30]; *Federal Prosecutors on LI Have Moved to Drop Criminal Charges Against 2 High-Ranking MS-13 Leaders*, NEWSDAY (July 7, 2025).[31])

## II.  DISCUSSION

### A.  <u>Standards Governing the Public's Rights of Access</u>

The public's right to access court proceedings and court records is protected under the both the First Amendment and the common law.  <u>Gannett Media Corp. v. United States</u>, No. 22-2160, 2022 WL 17818626, at *2 (2d Cir. Dec. 20, 2022).  Access to criminal proceedings "serves to allow public scrutiny of the conduct of courts and prosecutors," <u>United States v. Haller</u>, 87 F.2d 84, 86–87 (2d Cir. 1988), "informs the populace of the workings of government," and "fosters more robust democratic debate," <u>United States v. Doe</u>, 63 F.3d 121, 126 (2d Cir. 1995).

---

[27]  Available at https://www.propublica.org/article/bukele-trump-el-salvador-ms13-gang-vulcan-corruption-investigation; https://perma.cc/VF4D-XYNH

[28]  Available at https://www.wsj.com/opinion/does-bukele-have-a-pact-with-ms-13-two-american-indictments-allege-cooperation-e771f151?reflink=desktopwebshare_permalink

[29]  Available at https://www.nytimes.com/2025/06/30/us/politics/trump-bukele-ms-13-immigrants.html

[30]  Available at https://www.nationalreview.com/2025/07/trump-doj-drops-cases-against-top-ms-13-leaders/

[31]  Available at https://www.newsday.com/long-island/crime/ms-13-gang-members-tosses-indictment-trump-bukele-ff40w509?utm_medium=web_share_api&utm_campaign=web_share_api

"Judicial documents are subject at common law to a potent and fundamental presumptive right of public access." Mirlis v. Greer, 952 F.3d 51, 58 (2d Cir. 2020). Public access to judicial documents is also protected by a "qualified First Amendment right," Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004), which is understood to be "stronger than its common law ancestor and counterpart," United States v. Erie County, 763 F.3d 235, 239 (2d Cir. 2014).

The Second Circuit has identified two different approaches for determining whether First Amendment protection attaches to a judicial document. As the Second Circuit has explained:

> The so-called "experience and logic" approach requires the court to consider both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question. The courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness.

Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006) (cleaned up).

Once a First Amendment right of access is found to apply to a particular document, the document may only be sealed if the Court finds that "closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id. (cleaned up). In making this determination, courts look to a four-prong test set out by the Second Circuit to address these competing interests:

> First, the district court must determine, in specific findings made on the record, if there is a substantial probability of prejudice to a compelling interest of the defendant, government, or third party, which closure would prevent. Compelling interests may include . . . "the integrity of significant [government] activities entitled to confidentiality, such as ongoing undercover investigations or detection devices," and danger to persons or property. Second, if a substantial probability of prejudice is found, the district court must consider whether reasonable alternatives to closure cannot adequately protect the compelling interest that would be prejudiced by public access. Third, if such alternatives are found wanting, the district court should determine whether, under the circumstances of the case, the prejudice to the compelling interest override[s] the qualified First Amendment right of access. Fourth, if the court finds that closure is warranted, it should devise a closure order that, while not necessarily the least restrictive means available to protect the endangered interest, is narrowly tailored to that purpose.

21

Doe, 63 F.3d at 128 (cleaned up); see United States v. Zazi, No. 09-CR-663, 2010 WL 2710605, at *3 (E.D.N.Y. June 30, 2010) (applying this test in deciding to unseal plea agreements).

In analyzing the common law right of access, courts must first determine how much weight to give to this presumption of access. United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995). The weight accorded to this presumption depends on the "role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." Id. at 1049. In determining this weight, courts also consider whether the case and filings at issue involve matters of public interest and concern. See Lugosch, 435 F.3d at 123 n.5. There is also, generally, "a strong public interest in the manner in which criminal cases are conducted." Gannett Media, 2022 WL 17818626, at *3; see also Lugosch, 435 F.3d at 123 n.5.

"[A]fter determining the weight of the [common-law] presumption of access, the court must balance competing considerations against it,"—those "countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" Lugosch, 435 F.3d at 120 (cleaned up); see Mirlis, 952 F.3d at 61, 63 (sealing video deposition testimony concerning sexual abuse introduced at civil trial and contrasting situation to other cases involving crimes of "national importance," such as the ABSCAM criminal prosecutions, where unsealing was warranted); cf. Bradley on behalf of AJW v. Ackal, 954 F.3d 216, 232 (5th Cir. 2020) (explaining that, in determining whether to unseal settlement agreement, courts must consider whether agreement involves "public officials or parties of a public nature and matters of legitimate public concern" and citing multiple press reports in concluding that the case involved matters of "local and national concern").

## B.  First Amendment and Common Law Rights of Access Attach to the Motion to Dismiss

Here, the Government did not contest that its motion to dismiss and the subsequent related filings are judicial documents for which the public has a qualified First Amendment right of access, but nevertheless asserted that sealing was appropriate under the standard that governs such documents.  (See ECF Nos. 155, 165.)

Even absent this concession by the Government, the Court would still conclude, for the reasons set forth below, that the Government's motion to dismiss and the parties' subsequent filings concerning that motion are all judicial documents covered by both the qualified First Amendment right of access and the common law presumption of access.

"[C]riminal courts are presumptively open to the public."  Hartford Courant Co., LLC v. Carroll, 986 F.3d 211, 219 (2d Cir. 2021).  The Supreme Court has "recognized that the First Amendment grants both the public and the press a qualified right of access to criminal trials, to the examination of jurors during voir dire, and to preliminary hearings."  Hartford Courant, 380 F.3d at 91 (cleaned up).  "Numerous federal and state courts have also extended the First Amendment protection . . . to particular types of judicial documents, determining that the First Amendment itself, as well as the common law, secures the public's capacity to inspect such records."  Id. at 91–92.  Rights of access have been found to attach to various aspects of criminal cases, including plea proceedings and plea agreements, as well as pretrial motions, motions at trial and post-trial motions.  See United States v. Alcantara, 396 F.3d 189, 196 (2d Cir. 2005); United States v. Gerena, 869 F.2d 82, 85 (2d Cir. 1989).  The qualified First Amendment right of access has also been found applicable to records of criminal cases in state court that have ended in dismissal or *nolle prosequi*, which have parallels to motions to dismiss under Federal Rule of Criminal Procedure 48.  See Globe Newspaper Co. v. Pokaski, 868 F.2d 497, 510 (1st Cir. 1989).

Similarly, the Court finds here that motions to dismiss pursuant to Rule 48 are also judicial documents protected by both the qualified First Amendment right of access and the common law presumption of access.  The sealing of a motion to dismiss under Rule 48 defeats a central purpose of the rule, which "contemplates public exposure of the reasons for the abandonment of an indictment, information or complaint in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors."  United States v. Adams, No. 24-CR-556, 2025 WL 978572, at *15 (S.D.N.Y. Apr. 2, 2025) (quoting United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n, 228 F. Supp. 483, 486 (S.D.N.Y. 1964)).

## C. **Continued Sealing Was Not Warranted Here**

Having found that both constitutional and common law rights of access apply here, the Court turns to whether sealing of this particular Rule 48 motion was: (1) essential to preserve higher values and is narrowly tailored to serve that interest; and (2) whether balancing the common law presumption of access against countervailing factors warrants sealing.

At the outset, it must be stressed that these two criminal cases are of national importance and the Government's motion to dismiss implicates matters of significant public interest that are apparent from the facts of this case set out at length above, including:

(1) the indictments' serious charges alleging that the defendants' crimes have had grave consequences in the United States—charges the Government maintains are supported by "strong" evidence;

(2) the Government's contradictory statements about prosecuting leaders of MS-13 in U.S. courts;

(3) the Government's decision to seek dismissal of the charges against the defendant in order to send him to El Salvador, which the Government has asserted previously freed alleged members of the *Ranfla Nacional* despite extradition requests by the United States;

(4) the indictments' allegations of extraordinary and corrupt arrangements between MS-13 and the Salvadoran government; and

> (5) the apparent link between El Salvador's request for the MS-13 leaders in U.S. custody and the Venezuelans who were sent to El Salvador on March 15 pursuant to the AEA and are involved in ongoing litigation over their removal and continued imprisonment.

Additionally, Arevalo-Chavez's responses to the motion to dismiss also allege that he is likely to be tortured if sent to El Salvador.

The matters of public concern identified above give substantial added weight to the common law presumption of public access. And, as explained below, the Government's proffered grounds for sealing were, ultimately, insufficient to keep those filings from the public.

The Government's primary justification for continued sealing was that "premature disclosure of these filings potentially could have a dangerous and disruptive effect on operational security." (ECF No. 165.) According to the Government, "significant operational concerns, including the safety of the officers transferring the defendant," warranted "continued sealing until the operation is complete," at "which point all filed materials will be made public." (Id.)

The Court takes seriously concerns about operational security and the safety of all individuals involved in the transfer of a criminal defendant who is alleged to be a high-ranking member of MS-13. However, these concerns are, given all the circumstances here, insufficient to override the qualified First Amendment right of access or to prevail under the balancing test that applies to the common law right. The U.S. Government—including the United States Marshals Service and the Bureau of Prisons—has the resources and experience to handle and transport high-profile detainees who themselves present a danger or who may be a target for others. The Court is cognizant of the fact that every transfer of such a detainee involves some risk to the officers involved. However, the proffered concerns about operational security are insufficient in this case—which involves matters of significant public interest—to overcome the public's First Amendments or common law right of access.

Certain aspects of this case that weighed in favor of unsealing also merit brief discussion.

First, given El Salvador's public demands for the MS-13 leaders in U.S. custody and Lopez-Larios's earlier dismissal, it is difficult to see how the continued sealing of this motion to dismiss was necessary. Before the motion to dismiss was filed on April 1: (1) El Salvador's ambassador had publicly announced that President Bukele had requested that the leaders of MS-13 in U.S. custody be deported to El Salvador; (2) multiple media reports had been published about this request; (3) the Court had already granted and unsealed the motion to dismiss the charges against Lopez-Larios, which was the subject of multiple press reports; and (4) President Bukele had tweeted about Lopez-Larios' removal to El Salvador. Additionally, after the motion to dismiss was filed on April 1, it was reported that although El Salvador had not yet received "everyone [President Bukele] sought, . . . U.S. officials say they still intend to send additional gang leaders he has requested." (Apr. 30 N.Y. Times Article.) Another press report—which quoted an email memorializing El Salvador's request for nine MS-13 leaders—was further evidence that El Salvador was seeking the defendants from these two cases who were in custody, including Arevalo-Chavez. (Apr. 28 CNN Article.) Thus, the proverbial cat was largely already out of the bag by the time the Court unsealed the documents on May 22.

Second, the Government's proffered concerns about operational security and safety were largely conclusory. The Government elected not to expand on the particulars of these concerns in a sealed filing or ex parte letter.

Third, all the Government's sealed filings in connection with the motion to dismiss have been served contemporaneously on Arevalo-Chavez's counsel, who have discussed the motion to

dismiss with him. The fact that Arevalo-Chavez was well aware of the motion as of May 22 undercuts the Government's rationale for continued sealing.[32]

Fourth, Arevalo-Chavez previously appeared at numerous publicly-noticed court conferences, and was safely transported from Texas to New York following a publicly-noticed hearing in Texas. These points further undermine the Government's argument that sealing of the motion to dismiss was necessary for operational security and officer safety. Notably, Arevalo-Chavez and two other defendants appeared at a publicly-noticed status conference on April 1, 2025, only hours before the motion to dismiss was filed. This appearance occurred after El Salvador had publicly requested the MS-13 leaders in U.S. custody and after Lopez-Larios' dismissal had already been unsealed.

Additionally, the Government's actions in connection with the motion to dismiss Lopez-Larios and the March 15 flights to El Salvador gave the Court ample reason to question whether the Government's conclusory claims about operational and security concerns truly necessitated sealing in either this case or in Lopez-Larios' case. It should not be surprising that those events would make this Court skeptical of the Government's conclusory claims in this case concerning a purported need for continued sealing.[33]

The Government also asserted, in conclusory fashion, that "public disclosure of this motion before the operation is complete could cause harm to the government's relationship with a foreign ally." (ECF No. 165.) The Government, however, did not provide a declaration or any further details, to explain or buttress its claim that disclosure of the motion to dismiss was likely to harm

---

[32] The Court also notes that, in response to the order to show cause, Arevalo-Chavez did not ask for continued sealing. While that is certainly not dispositive, it indicates that he at least believes that public notice of the motion to dismiss would not threaten his own safety.

[33] With the benefit of hindsight, the Court must admit that it erred in sealing the filings concerning Lopez-Larios.

the relationship with El Salvador. The Government's showing on this ground was simply insufficient to justify sealing.

Most importantly, the Government's argument about foreign policy concerns was undermined by the fact that the Government itself conceded that the motion should be unsealed after the defendant was transferred to Salvadoran custody. The Court cannot fathom, and the Government did not even attempt to explain, why unsealing these documents prior to the defendant's transfer risked harming the relationship with El Salvador when, even under the Government's own proposed approach, these filings would have been made public immediately after the operation was complete.[34]

The Government's foreign policy argument was further undermined by the fact that El Salvador had already publicly requested that the leaders of MS-13 in U.S. custody be sent to El Salvador (and had also received Lopez-Larios). In light of that well-publicized request and transfer, it is difficult to see how public disclosure of the Government's motion to dismiss, prior to the Court's ruling on the motion, was likely to cause harm to the relationship with El Salvador.

Finally, the Government also contended that continued sealing was warranted because the details of the charges pending against the defendant in El Salvador "may not have been made public there" and sealing could "protect the integrity of the foreign prosecutions." (ECF No. 170

---

[34] The only case the Government cites in support of this rationale for sealing is distinguishable. In United States v. Trabelsi, No. CR 06-89, 2015 WL 5175882, at *8 (D.D.C. Sept. 3, 2015), the defendant had sought production of "inter-governmental correspondence" between Belgium and the United States concerning the defendant's extradition, which the defendant intended to use to support his motion to dismiss the indictment. Both Belgium and the United States objected to public disclosure of these confidential documents and the Government represented that disclosure would have a detrimental impact on the United States' relationship with Belgium and the United States' cooperative extradition relationships with other countries. Id. The court—which stressed that the "discovery process is not normally" public—ordered that any production would be under seal and subject to a protective order, and directed that any subsequent filings that referenced those documents would have to be filed under seal. Id. at 8–9.

Trabelsi is distinguishable on multiple grounds. Unlike the present case, where the Government conceded that the motion to dismiss should be unsealed in the near future, the Government sought permanent sealing in Trabelsi.

at 4 (emphasis added); see ECF No. 165 at 2.)  This argument certainly did not justify continued sealing of all the filings concerning the motion to dismiss.  Moreover, in its May 29 response to the Court's Order to Show Cause, the Government conceded that the charges and arrest warrants at issue are, in fact, publicly available.  Accordingly, this proffered rationale was not a viable justification for continued sealing of any of the filings.

The Court also notes that while the Government initially asserted that unsealing could potentially jeopardize the integrity of prosecutions in El Salvador, the Government's later submissions disclosed that, for two of the charges, the defendant has already been tried, and sentenced, in absentia.  The Government never explained how unsealing would have compromised those already completed prosecutions[35] or the open charge against Arevalo-Chavez in El Salvador.

### III.  CONCLUSION

Based on all the reasons set forth above, the Court unsealed many of the filings concerning the motion to dismiss on May 22 and unseals, with limited exceptions set out below, the remainder of those filings today.  The Clerk of Court shall unseal the letters filed as ECF Nos. 170, 173, 174, and 175, as well as the Court's May 22, 2025 Order, ECF No. 177.  The Clerk of the Court, however, shall not unseal the exhibits attached to ECF Nos. 173 and 175.

A status conference in this case has been scheduled for July 23, 2025 at 11:00 AM.

**SO ORDERED.**

Dated: July 16, 2025
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

---

[35]  The record does not indicate whether, as of April 1 (when the motion to dismiss was filed) or April 30 (when the Government filed its reply papers), the Government was even aware that Arevalo-Chavez had already been tried and sentenced, in absentia, on these two charges.  Certainly, neither of those filings informed the Court that the defendant had been tried and convicted in absentia on these charges.